IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DIANA MARIE SALMONS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:19CV00532 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| COMMERCIAL DRIVER SERVICES, | ) | By: Hon. Glen E. Conrad |
| INC., | ) | Senior United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Diana Marie Salmons filed a five-count complaint against her former employer, Commercial Driver Services, Inc. ("CDS").[1] Count I is a claim for sexual harassment and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"). Counts II and III allege claims of discriminatory and retaliatory constructive demotion and constructive discharge, respectively, in violation of Title VII. Counts IV and V allege sex-based wage discrimination in violation of Title VII and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (the "Equal Pay Act").

CDS moved to dismiss all of Salmons' claims under Federal Rule of Civil Procedure 12(b)(6). On November 18, 2019, the parties presented oral argument in a telephonic hearing. During that hearing, Salmons moved for leave to amend her wage discrimination claims, and CDS moved for a discovery stay until the court ruled on CDS' motion. The court granted both motions. Salmons has since filed an amended complaint, and CDS has filed an answer in response. CDS' motion to dismiss is thus ripe for review. For the reasons stated, the court will deny CDS' motion

---

[1] Salmons attached a right-to-sue letter, which was issued by the Equal Employment Opportunity Commission on May 1, 2019. ECF No. 1-1.

to dismiss in whole and lift the stay of discovery.

## Background

The following facts, alleged in the amended complaint, are taken as true for purposes of CDS' motion. CDS is a Virginia-based truck driver training and job placement program with several locations throughout Virginia. Am. Compl. ¶ 8. On June 6, 2014, Salmons, "who identifies her sex as female," was hired by CDS as an Instructor at CDS' Roanoke location. Id. ¶ 9. Salmons was a Co-Lead Instructor there from 2015 until September 2017. Id. ¶ 15. CDS failed to have an anti-discrimination or anti-harassment policy in place during Salmons' employment. Id. ¶ 10.

### *Harassment Allegations*

Salmons alleges numerous examples of "unwelcome inappropriate remarks and sexually aggressive behavior at CDS." Id. ¶ 19. For example, male CDS employees made the following remarks about female students: "Boy, she's got some big melons," "I'd like to get in her pants," "I'll do her," "She can back that up on me," and "She can drive me anytime." Id. Several male employees "inappropriately and consistently" called Salmons "Dirty D," and "often lewdly discussed their genitalia" in front of Salmons. Id. Another male employee, J.R. Mays, "slapped" Salmons "on the buttocks," and told Salmons that he "would take [her] to bed any time." Salmons reported Mays' "sexual misconduct to CDS management twice, but, upon information and belief, [] Mays was never appropriately disciplined." Id. Salmons witnessed, during a company bowling outing, that other female employees and students were asked by a male employee, Matt Walfare, to "hold his balls" as he held two bowling balls in front of his crotch. Salmons also alleges that "[s]everal members of CDS management were present at this event and, upon information and belief, heard [the] inappropriate comment, but [] Walfare was never counseled about, or disciplined for, his misconduct." Id.

2

Salmons further states that she was CDS' sole female Instructor for the first year of her employment, that "her male colleagues resented having to work for or under the supervision of a female supervisor," and that male employees worked to undermine her. Id. ¶ 20. For example, CDS employees directed students to ignore her instructions and to provide false, negative reviews. Id. A male Instructor, Walfare, advised multiple students that Salmons "doesn't know what she is doing. She got her [supervisor] position because she cried and whined about it." Id. Walfare also admitted to a student that he, and other Instructors, were reporting allegations regarding Salmons to CDS because the Instructors did not want her as their boss. Id.

Salmons also alleges that she was disciplined for mistakes that men were not. For example, her truck became stuck. She was written up and her male co-workers were not disciplined for the same errors. After complaining that she did not think the write-up was fair on that basis, Salmons "was treated differently." Compl. Ex. B.

In addition, several CDS students made a sex discrimination complaint to Patrick Henry Community College about the environment at CDS, and made a similar complaint to CDS management. Ultimately, the students filed a complaint with the Department of Education, which resulted in Patrick Henry not renewing its contract with CDS. Id. ¶ 28.

Salmons alleges that CDS' failure to address her discrimination claims led her to step down from her role as Co-Lead Instructor in September 2017. Salmons brought her concerns to CDS General Manager Crystal Kennedy on several occasions. On one such occasion, in September 2017, Kennedy responded by telling Salmons to "stop pouting and put your big boy panties on." Id. ¶ 21. Walfare also told students that Salmons was forced to step down from her leadership position because "no one would listen to a woman." Id. ¶ 23. As stated in an email attached to Salmons' amended complaint, she "felt forced to step down from [her] supervisor

position . . . because of all the harassment[.] I just could not take it anymore." Am. Compl. Ex. B.

In January 2018, Salmons met with Kennedy to discuss how a male employee, Everett Markham, had been treating her. Kennedy declined to file a formal complaint or take other action on Salmons' behalf, and instead invited Markham into her office, and told Markham that Salmons intended to file a complaint against him. Thereafter, Markham "angrily rebuke[d]" Salmons, "curse[d] at her," and spoke to Salmons "in a demeaning way." Am. Compl. ¶ 26. Kennedy also told Salmons that she had no recourse and that she shared the blame for her workplace conditions. Id. ¶ 27. Salmons further described this encounter in the email attached to her complaint. Salmons relayed that "[Kennedy] wouldn't let me get up and leave[.] She stated you called this meeting and we will settle this today and be done with it." Am. Compl. Ex. B.

Further, on April 9th and 19th, 2018, Salmons complained about the harassment she endured to CDS President Jill Balleh, Vice President Chris Pender, and again, Kennedy. Am. Compl. ¶¶ 29–31. Salmons stated she was concerned about being retaliated against for her complaints. Salmons also explained that she had stepped down from her Co-Lead Instructor role due to harassment, and asked to be reinstated. Balleh and Pender denied Salmons' request. Id. They told her, instead, to meet with Markham alone. Id. Salmons told them she was "scared of" Markham due to his "past aggressive behavior." Balleh nevertheless insisted. Id. Later, Markham cornered Salmons and "cursed her." Id. ¶ 35. Eventually, Salmons feared for her safety, to the point that she told Markham she would call the police if he did not cease his behavior. Id.

"Left with no other choice," as she "could no longer risk her personal safety," Salmons resigned on July 9, 2018. Id. ¶ 31. Salmons has sought "ongoing medical care due to the discriminatory and retaliatory acts she suffered at CDS." Id. ¶ 32.

*Unequal Pay Allegations*

Salmons also alleges that CDS instituted a "discriminatory pay scheme" in which male employees were paid more than female employees. Markham and Salmons also held the same job titles at different times, first as Instructor, then as Co-Lead Instructor. Salmons alleges that as Instructors, she and Everett Markham performed similar tasks: teaching students how to drive tractor trailer trucks in the classroom and on the range. Id. ¶¶ 13–18. Their training, experience, and working conditions were similar. As Co-Lead Instructors, Markham and Salmons divided managerial responsibilities between them and covered each others' tasks when one of them was not at work. Their shared tasks as Co-Lead Instructors included teaching students, overseeing truck maintenance, and "cover[ing] the daily assignment board" for students. Id. Salmons describes additional tasks she performed, which she does not indicate that Markham performed. These tasks included writing waivers, submitting time records, handling vacation requests, and ensuring that fuel receipts were reported. Id.

Salmons alleges that, despite she and Markham performing the same tasks—and at some times—holding the same title, CDS paid Markham a higher salary than Salmons. When CDS promoted Salmons to Co-Lead Instructor in 2015 until CDS promoted Markham to the same position in May 2017, Salmons was Markham's superior and performed management tasks in addition to training. After CDS promoted Salmons, but before CDS had promoted Markham, a fellow employee informed Salmons that Markham was making more money than her, despite her additional responsibilities. Salmons alleges that this pay disparity continued after Markham's promotion. Id. Moreover, Salmons did not receive a pay increase after her promotion, despite her added responsibilities.

**Standard of Review**

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotation marks omitted).

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint . . . ." Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). Thus, in ruling on a 12(b)(6) motion, all well-pleaded allegations in the complaint are to be taken as true and all reasonable factual inferences are to be drawn in the plaintiff's favor. Id. at 244. To survive such review, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than "a sheer possibility" that a defendant is liable for unlawful conduct. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"[A] complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination" under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), in order to survive a motion to dismiss. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511–15 (2002). Rather, proof of a prima facie case is an "evidentiary standard, not a pleading requirement." Id. at 510. Accordingly, the plaintiff is not required to "plead facts establishing a prima facie case of discrimination to survive a motion to dismiss." McCleary-Evans v. Md. Dep't of Transp., 780 F.3d 582, 585 (4th Cir. 2015). Nevertheless, a plaintiff must still "'allege facts to satisfy the elements of a cause of action created by [the relevant]

6

statute' in compliance with Iqbal." Woods v. City of Greensboro, 855 F.3d 639, 648 (4th Cir. 2017) (quoting McCleary-Evans, 780 F.3d at 585). In sum, and as with other causes of action, the court must determine whether the plaintiff has stated a claim for relief that is plausible, and not merely speculative. McCleary-Evans, 780 F.3d at 585–86.

## Discussion

### I. Sexual Harassment and Hostile Work Environment

Salmons' detailed allegations describe CDS as a workplace rife with pervasive and severe sexual harassment. As a result, CDS' arguments for dismissing Salmons' harassment and hostile work environment claim fail completely.

Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment," because of her sex. 42 U.S.C. § 2000e–2(a)(1). "'Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action.'" Freeman v. Dal–Tile Corp., 750 F.3d 413, 420 (4th Cir. 2014) (quoting EEOC v. R & R Ventures, 244 F.3d 334, 338 (4th Cir. 2001)). To establish a Title VII hostile work environment claim based on sex, a plaintiff must show that "the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc) (citation omitted); Prince-Garrison v. Maryland Dep't of Health & Mental Hygiene, 317 F. App'x 351, 354 (4th Cir. 2009).

"Element three of a hostile work environment claim requires a showing that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive'; the plaintiff

may, but is not required to, establish that the environment is 'psychologically injurious.'" Boyer–Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)). This element has both subjective and objective components. See Dal–Tile Corp., 750 F.3d at 421. "Whether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" Boyer–Liberto, 786 F.3d at 277 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)). "That determination is made 'by looking at all the circumstances,' which 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Harris, 510 U.S. at 23). Additionally, "the totality of the circumstances includes conduct directed not at the plaintiff." Hoyle v. Freightliner, LLC, 650 F.3d 321, 333 (4th Cir. 2011).

As to the fourth element, an employer may be liable for hostile work environments created by co-workers and third parties if the employer "knew or should have known about the harassment and failed to take effective action to stop it by responding with remedial action reasonably calculated to end the harassment." Pryor v. United Air Lines, Inc., 791 F.3d 488, 498 (4th Cir. 2015) (internal quotation marks, citation, and alterations omitted). In evaluating the employer's response, courts consider the promptness of any investigation, the specific remedial measures taken, and the effectiveness of those measures. Id.

CDS primarily argues that Salmons has not alleged that CDS created a work environment that was sufficiently hostile or severe to state a claim under Title VII, and that Salmons' allegations are not specific enough. CDS is wrong.

8

This is not a close case. Salmons has alleged more than enough facts for it to be plausible that she faced harassment and a hostile work environment at CDS. Salmons recounts repeated lewd and lascivious comments made by multiple employees, directed at her and other female employees. She also describes unwanted sexual touching by one of her co-workers. Employees continued this behavior over a number of years. Moreover, CDS management heard her complaints—as well as complaints from CDS' students—and allegedly let that harassment continue. But that is not all. According to Salmons, CDS management insulted her and blamed her for the sex-based harassment she faced. Taking Salmons' allegations as true, which it must, the court does not hesitate in allowing this claim to proceed.

## II. Discriminatory and Retaliatory Constructive Demotion and Discharge

CDS' arguments for dismissing Salmons' retaliation claims are similarly without merit. When Salmons complained about the harassment she faced, CDS management failed to act, and Salmons alleges that she faced heightened harassment afterwards.

Title VII contains an antiretaliation provision making it "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . (1) because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or (2) because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). To state a claim of retaliation in violation of Title VII, a plaintiff must show "(1) that she engaged in a protected activity," "(2) that her employer took an adverse employment action against her," and "(3) that there was a causal link between the two events." EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405–06 (4th Cir. 2005); Brown v. Virginia Dep't of Transp., No. 7:07-CV-00282, 2008 WL 2156326, at *4 (W.D. Va. May 22, 2008) (Conrad, J.).

The court begins by examining the first element. The allegations clearly show that Salmons reported her concerns of sexual harassment to CDS. Therefore, the court concludes that Salmons has alleged that she engaged in a protected activity.

The court next turns to the second element: adverse employment action. "A constructive discharge occurs when 'an employer deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit.'" Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985) (citing Holsey v. Armour & Co., 743 F.2d 199, 209 (4th Cir.1984)). "A plaintiff claiming constructive discharge must therefore 'prove two elements: deliberateness of the employer's action, and intolerability of the working conditions.'" Marmon v. R. A. Lilly & Sons, Inc., No. 7:13-CV-00074, 2015 WL 4231303, at *8 (W.D. Va. July 10, 2015) (Conrad, J.) (quoting Bristow, 770 F.2d at 1255) (granting summary judgment after finding no constructive discharge). "An employer acts deliberately when 'the actions complained of were intended by the employer as an effort to force the employee to quit.'" McKinley v. Salvation Army, 192 F. Supp. 3d 678, 684 (W.D. Va. 2016) (Conrad, J.), aff'd, 685 F. App'x 227 (4th Cir. 2017) (quoting Bristow, 770 F.2d at 1255). This requires "proof of the employer's specific intent to force an employee to leave," either through direct evidence or circumstantial evidence, which may include "a failure to act in the face of known intolerable conditions." Bristow, 770 F.2d at 1255. However, "[a] complete failure to act by the employer is not required; an employer may not insulate itself entirely from liability by taking some token action in response to intolerable conditions." Amirmokri v. Balt. Gas & Elec. Co., 60 F.3d 1126, 1133 (4th Cir. 1995).

It appears that the United States Court of Appeals for the Fourth Circuit has not yet squarely addressed whether a claim for constructive demotion should be recognized under Title VII. See Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994) ("Demotion can constitute a constructive discharge,

especially where the demotion is essentially a career-ending action or a harbinger of dismissal."). Other Courts of Appeal have recognized constructive demotion as a natural extension of constructive discharge, holding that the same standards apply. See Garcia v. Dep't of Homeland Sec., 437 F.3d 1322, 1346 (Fed. Cir. 2006); Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 717 (8th Cir. 2003); Simpson v. Borg–Warner Auto., Inc., 196 F.3d 873, 876 (7th Cir. 1999); Sharp v. City of Houston, 164 F.3d 923, 933 (5th Cir. 1999); see also Russell v. Drabik, 24 F. App'x 408, 411 (6th Cir. 2001). Similarly, other District Courts within the Fourth Circuit have reached the same conclusion.[2] This court will follow suit and recognize constructive demotion as a claim under Title VII.

Salmons has plausibly alleged that she was constructively discharged and demoted. Salmons alleges that she raised complaints about the sexual harassment she faced to CDS management. In response to one complaint, Kennedy told Salmons to "stop pouting and put your big boy panties on," and told her she shared the blame for what she had experienced. Am. Compl. ¶¶ 21, 27. Kennedy also told Salmons there was "nothing she [could] do." Id. Ex. B. These allegations describe a complete failure by CDS to respond to Salmons' complaints of harassment.

Salmons alleges even more than that. Her additional complaints led to further allegedly worsened conditions at CDS. These allegations further support the inference that CDS intended to force Salmons out. Specifically, when Salmons complained about Markham's behavior, Kennedy allegedly brought Markham in and allowed him to angrily confront Salmons. Salmons' fears of physical harm and descriptions of subsequent abusive behavior plausibly demonstrate that

---

[2] See, e.g., Petrovsky v. United States Attorney Gen., Dep't of Justice-Bureau of Prisons, No. 1:16-CV-44, 2018 WL 1937070, at *8 (N.D. W. Va. Apr. 24, 2018); Gray v. Walmart Stores, Inc., No. 7:10-CV-171, 2011 WL 1831780, at *5 (E.D.N.C. May 12, 2011); Cuffee v. Tidewater Cmty. Coll., 409 F. Supp. 2d 709, 718 (E.D. Va.), aff'd, 194 F. App'x 127 (4th Cir. 2006); Bryan v. Lucent Technologies, Inc., 307 F. Supp. 2d 726, 738 (D. Md. 2004).

CDS had become an intolerable place for Salmons to work. In Salmons' own words to Balleh: she "just could not take it any more." Id.

Finally, the court looks to causation. In determining whether there is a causal connection between the protected activity and the adverse employment action, the Fourth Circuit has held that a causal connection may be found "where the employer takes an adverse employment action against an employee shortly after learning of the protected activity." Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004); Silva v. Bowie State Univ., 172 F. App'x 476, 478 (4th Cir. 2006) (reversing grant of motion to dismiss, and concluding that a ten-week lapse of time sufficiently established a claim of retaliation). Yet even in the absence of close temporal proximity, other evidence of "retaliatory animus" during the intervening period may be used to prove causation. See Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007) (reversing grant of summary judgment, ruling that reduced job responsibilities and authority in intervening four-month period showed causation).

CDS argues that Salmons has not alleged a causal connection between her complaints and the purported retaliation. CDS is again wrong. Here, Salmons has alleged that she complained to Kennedy in September 2017 and stepped down from her role as Co-Lead Instructor in the same month after being treated differently and "feeling forced to step down . . . because of all the harassment." Am. Compl. Ex. B. Salmons alleges further that a roughly ten-week period passed between her final complaint to Kennedy and her resignation. During the latter period, CDS denied Salmons reinstatement to her Co-Lead Instructor position. These facts create a plausible inference of causation. See Silva, 172 F. App'x at 478. The court will allow Salmons' retaliation claims to proceed.

## III. Sex-Based Wage Discrimination

The court concludes by examining Salmons' wage discrimination claims. These claims, too, will proceed. Salmons has alleged facts that allow the plausible inference that CDS paid Salmons less than it paid men for substantially equal work.

Together, the Equal Pay Act and Title VII prohibit sex-based wage discrimination. See 29 U.S.C. § 206(d) and 42 U.S.C. §§ 2000e, et seq. To state a claim under the Equal Pay Act, a plaintiff must allege that "(1) the defendant-employer paid different wages to an employee of the opposite sex (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions." U.S. Equal Employment Opportunity Comm'n v. Maryland Ins. Admin., 879 F.3d 114, 120 (4th Cir. 2018). Any disparity in pay is typically shown by a "factor-by-factor" comparison to a specific male comparator. Houck v. Va. Polytechnic Inst. and State Univ., 10 F.3d 204, 206 (4th Cir. 1993).

A proper comparator for Equal Pay Act purposes performs work "substantially equal" to that of the plaintiff. Wheatley v. Wicomoco Cty., 390 F.3d 328, 332 (4th Cir. 2004) (citations and internal quotation marks omitted). Although application of the Equal Pay Act "is not restricted to identical work," Brennan v. Prince William Hosp. Corp., 503 F.2d 282, 291 (4th Cir. 1974), "the jobs involved should be virtually identical, that is . . . very much alike or closely related to each other." Wheatley, 390 F.3d at 333 (internal quotation marks omitted)). This requires more than a mere showing that the plaintiff and the putative comparator share the same job title. Wheatley, 390 F.3d at 332. The analysis turns on whether the jobs to be compared share a "common core" of tasks. Spencer v. Virginia State Univ., No. 3:16-CV-989, 2017 WL 1289843, at *6 (E.D. Va. Apr. 4, 2017).

13

Similarly, a Title VII wage discrimination claim requires that a plaintiff allege that (1) she is a member of a protected class, (2) she was performing her job satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive. Spencer v. Virginia State Univ., 919 F.3d 199, 207–08 (4th Cir. 2019), as amended (Mar. 26, 2019), cert. denied, No. 19-30, 2019 WL 5150504 (U.S. Oct. 15, 2019). "Title VII requires the compared jobs to be only "similar" rather than "equal," as required under the Equal Pay Act." Id. "While Title VII's 'similarity' requirement demands less of plaintiffs than the Equal Pay Act's 'equality' requirement, it is not toothless: the plaintiff must provide evidence that the proposed comparators are not just similar in some respects, but similarly-situated in all respects." Id. at 207–08 (internal quotation marks omitted).

After reviewing the revised pleadings and applicable case law, the court concludes that Salmons' amended complaint alleges enough facts to state plausible claims of wage discrimination under the Equal Pay Act and Title VII. Here, Salmons alleges that CDS paid Markham a higher salary than it paid her. Salmons also alleges that she and Markham shared the same job titles and performed substantially equal tasks. Indeed, to the extent that Salmons alleges differences in their job tasks, she alleges that she performed more tasks than Markham, beyond those on which they overlapped. Although Salmons alleges that there were negative reviews of her performance, she plausibly alleges that they were false and motivated by animus. See, e.g., Am. Compl. ¶ 20 (describing false, negative reviews, which were admittedly directed by Salmons' co-workers); id. ¶ 23 (alleging that Walfare stated "no one would listen to a woman"). These facts support plausible claims under the Equal Pay Act and Title VII.

## Conclusion

For the reasons stated, the court denies CDS' motion to dismiss. Because the court denies CDS' motion, the court will also lift the previously-imposed stay of discovery.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 13th day of December, 2019

_____
Senior United States District Judge